IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MATSON NAVIGATION COMPANY, INC.,

1411 Sand Island Parkway
Honolulu, HI,

    Plaintiff,

 v.

DEPARTMENT OF TRANSPORTATION

1200 New Jersey Avenue, S.E.
Washington, D.C. 20590, and

MARITIME ADMINISTRATION,

1200 New Jersey Avenue, S.E.
Washington, D.C. 20590,

    Defendants.

Civil Action No. 1:20-cv-2779

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Matson Navigation Company, Inc. ("Matson" or "Plaintiff"), for its complaint against the Department of Transportation and the Maritime Administration ("MARAD") (collectively "Defendants"), by and through its attorneys, alleges as follows:

### INTRODUCTION

1. This action arises from MARAD's approval of a vessel for inclusion in the Maritime Security Program (the "MSP"), which MARAD, an agency within the Department of Transportation, administers pursuant to the Maritime Security Act of 2003 (the "MSA"), as amended.

2. The MSP provides financial assistance to the operators of certain U.S.-flag vessels operating in foreign commerce, in part to compensate for the higher costs of building, maintaining, and operating U.S.-flag vessels, as well as to advance national security by ensuring that the United

States maintains a viable U.S.-flag presence in international commercial shipping.  *See* 46 U.S.C. § 53102(a); 139 Cong. Rec. H8832 (Nov. 4, 1993) (discussing a predecessor program to the MSP).

3.      Not all vessels operating in international shipping are eligible for MSP subsidies. The vessel must meet a number of eligibility requirements.

4.      The vessel must be self-propelled and must be "a tank vessel that is 10 years of age or less on the date the vessel is included in the Fleet; or . . . any other type of vessel that is 15 years of age or less on the date the vessel is included in the Fleet."  46 U.S.C. § 53102(b)(3).

5.      The vessel must be "suitable for use by the United States for national defense or military purposes in time of war or national emergency, as determined by the Secretary of Defense," and must be "commercially viable, as determined by the Secretary."  46 U.S.C. § 53102(b)(4).

6.      The vessel must be "a United States-documented vessel" or if not a United States-documented vessel, the owner of the vessel must have "demonstrated an intent to have the vessel documented under [46 U.S.C. chapter 121] if it is included in the [MSP] Fleet," and "at the time an operating agreement for the vessel is entered into under this chapter, the vessel [must be] eligible for documentation under [46 U.S.C. chapter 121]," *id.* § 53102(b)(5).

7.      Additionally, to protect U.S.-flag vessels operating in domestic trade from unfair competition from subsidized vessels, MSP vessels "shall be operated exclusively in the foreign commerce or . . . in mixed foreign commerce and domestic trade allowed under a registry endorsement," and "shall not otherwise be operated in the coastwise trade."  46 U.S.C. § 53105(a)(1); *see also* 46 C.F.R. §§ 296.2, 296.11.

8.      Moreover, other than a replacement vessel under 46 U.S.C. § 53105(f), any vessel "first covered by an operating agreement after the date of the enactment of the National Defense

Authorization for Fiscal Year 2018" shall "not be operated in the transportation of cargo between points in the United States and its territories either directly or via a foreign port."  46 U.S.C. § 53105(a)(2).

9.      MSP subsidies are awarded to identified vessels pursuant to written agreements.  A vessel under an active existing agreement may be replaced with a different subsidized vessel only with the approval of the Secretary of Transportation and the Secretary of Defense or their delegees. *See* 46 U.S.C. § 53105(f).  A replacement vessel must meet then-current eligibility requirements.

10.     Additionally, the operating agreements entered into by participants in the MSP require "heel to toe" vessel replacement, which means that MARAD will not allow a current MSP vessel to be replaced, and thus leave the fleet, until the participant has a replacement vessel approved by MARAD and USTRANSCOM that is ready to begin operating.

11.     This case involves MARAD's approval of a vessel now known as the APL SAIPAN for inclusion in the MSP Fleet under MSP Operating Agreement Number MA/MSP-57.

12.     MARAD initially approved the APL SAIPAN in an order dated December 20, 2016 (the "2016 Approval Order"), but this Court vacated and remanded the 2016 Approval Order on the ground that the agency "either completely failed to explain its reasons for approving the [APL SAIPAN] or entirely failed to consider an important aspect of the question before it and thus failed to comply with the APA."  *Matson Navigation Co. v. U.S. Dep't of Transp.*, — F. Supp. 3d —, 2020 WL 2800734, at *1 (D.D.C. June 12, 2020) (Moss, J.).

13.     On remand, MARAD purported to "reinstate" the APL SAIPAN to the MSP Fleet in an order dated August 3, 2020 (the "2020 Approval Order"), which adopted and incorporated by reference a memorandum from MARAD's staff (the "Staff Memorandum") and a legal memorandum from the Chief Counsel (the "Chief Counsel Memorandum").

3

14.     During the proceedings leading up to the 2020 Approval Order, Matson filed a timely petition to intervene in the proceedings pursuant to 5 U.S.C. § 555(b) and 46 C.F.R. § 201.78.  By letter dated August 3, 2020, MARAD denied Matson's petition to intervene (the "Intervention Order").

15.     The APL SAIPAN is operated by APL Lines, Inc., APL Marine Services, Ltd., and APL Maritime, Ltd. (together, "APL").  APL intervened in the previous litigation.

16.     The APL SAIPAN carries cargo originating on the west coast of the United States to and from Guam and Saipan, both of which are U.S. territories.  It directly competes with Matson's unsubsidized vessels that operate in these domestic trade routes.

17.     The APL SAIPAN was built in 2002 and was more than 15 years old at the time of the 2020 Approval Order.

18.     The APL SAIPAN is ineligible for MSP subsidies because it does not meet the age requirements of 46 U.S.C. § 53102(b)(3), it does not operate exclusively either in foreign trade or in mixed foreign trade and domestic trade permitted under a registry endorsement issued pursuant to 46 U.S.C. § 12111, and it engages in impermissible transportation of cargo between points in the United States and its territories in violation of 46 U.S.C. § 53105(a)(2).  Accordingly, MARAD acted contrary to law in purporting to "reinstate" the APL SAIPAN to the MSP Fleet.  Additionally, MARAD failed to make all necessary findings of eligibility required under 46 U.S.C. § 53102.

19.     The Intervention Order denying Matson's petition to intervene pursuant to 5 U.S.C. § 555(b) and 46 C.F.R. § 201.78 contravened the mandates of the APA, due process, and MARAD's own regulations.

20.     Matson seeks judicial review of the 2020 Approval Order and the Intervention Order on the grounds that they were arbitrary, capricious, and an abuse of discretion within the

meaning of the Administrative Procedure Act, 5 U.S.C. § 701 et seq. (the "APA"), and were otherwise contrary to law or unsupported by substantial evidence in the administrative record. *See* 5 U.S.C. § 706.

21.     For the reasons summarized above and explained more fully below, Matson respectfully requests that this Court hold unlawful, vacate, terminate, and set aside the 2020 Approval Order and the Intervention Order.

## JURISDICTION AND VENUE

22.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331. This Court is authorized to issue the non-monetary relief sought herein pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and the APA, 5 U.S.C. §§ 702, 705, 706.

23.     The 2020 Approval Order is "final" for purposes of the APA, 5 U.S.C. § 701 et seq. This action is timely because it is brought within six years after the 2020 Approval Order was issued. *See* 28 U.S.C. § 2401(a).

24.     The Intervention Order is "final" for purposes of the APA, 5 U.S.C. § 701 et seq. This action is timely because it is brought within six years after the Intervention Order was issued. *See* 28 U.S.C. § 2401(a).

25.     Venue is proper in this judicial district under 28 U.S.C. § 1391(e) because Defendants are agencies of the United States, they reside in this judicial district, and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

26.     Matson was not required to exhaust its administrative remedies before filing suit as to the 2020 Approval Order.  MARAD's implementing regulations require, and authorize, administrative appeals only by MSP "Contractors," and MARAD ruled in a prior proceeding that Matson is not a Contractor entitled, or required, to invoke the administrative appeal process.

Similarly, Matson cannot have waived or forfeited any allegation or argument by not previously presenting it to the agency, because there was and is no process by which such presentation could have been made.

27.     Nevertheless, Matson filed a timely petition to intervene and exhausted its administrative remedies with respect to the Intervention Order.  Matson made a substantive submission to the agency raising the arguments it asserts here.

## PARTIES

28.     Plaintiff Matson provides ocean freight carrier services from the U.S. west coast to Alaska, Asia, Hawaii, Guam, the Northern Mariana Islands (which include Saipan), and other ports of call in the Pacific Ocean.  Matson has been providing ocean freight carrier services in the Pacific region since 1882.  Matson is a Hawaii corporation that maintains its headquarters in Honolulu, Hawaii.  Matson is a wholly owned subsidiary of Matson, Inc., a publicly traded Hawaii corporation.

29.     Defendant Department of Transportation is an executive agency of the United States government, headed by the Secretary of Transportation.  The Secretary of Transportation is authorized by statute to establish the MSP, award operating agreements, make payments under the MSP, and prescribe rules in order to implement the MSP.  46 U.S.C. §§ 53101–53111.

30.     Defendant MARAD is an administrative agency within the Department of Transportation, led by the Maritime Administrator.  The Secretary of Transportation has delegated the administration of the MSP to the Maritime Administrator.  49 C.F.R. § 1.93(a).  As a result, MARAD has the responsibility to prescribe regulations, determine vessels' eligibility for the MSP, award operating agreements under the MSP, and approve vessels.

31.     Non-party APL Lines, Inc. is a shipping company organized in Delaware.  APL Lines, Inc. is owned, through a series of subsidiaries, by the French corporation CMA CGM S.A. APL Lines, Inc., APL Marine Service, Ltd., and APL Maritime, Ltd. serve several of the same routes and its vessels call at some of the same ports as Matson's.  Matson and APL are direct competitors in the provision of ocean freight services to Guam and Saipan.

## STATUTORY AND REGULATORY BACKGROUND

### I.     Congress Promotes U.S. Shipping in Domestic Trade Routes

32.     "From the earliest days of the Republic, Congress has been concerned with stimulating and protecting the growth of an American-built and controlled coastwise Merchant Marine," and has enacted legislation granting preferential treatment to U.S.-built and U.S.-flagged vessels.  *Penn. R.R. Co. v. Dillon*, 335 F.2d 292, 295 n.5 (D.C. Cir. 1964) (citing An Act Imposing Duties on Tonnage, 1 Stat. 27–28 (1789)).  Among other things, the federal government has long promoted the domestic shipping industry by limiting access to trade routes between points within the United States to domestic carriers.

33.     Congress strengthened these long-standing protections for the domestic shipping industry in 1920 by passing the Jones Act.  *See* Merchant Marine Act of 1920, Pub. L. No. 66-261, § 27 (1920).

34.     Now codified at 46 U.S.C. § 55101 et seq., the Jones Act provides that "a vessel may not provide any part of the transportation of merchandise . . . between points in the United States to which the coastwise laws apply, either directly or via a foreign port," unless the vessel was built in the U.S. and is owned by a U.S. citizen, or else an exception applies.  46 U.S.C. § 55102(b); *see also* 46 U.S.C. § 12112.

35.     Because the Jones Act does not authorize direct subsidies to domestic carriers, it allows the federal government to promote the domestic shipping industry "without direct cost to the taxpayers." *Indep. U.S. Tanker Owners Comm. v. Lewis*, 690 F.2d 908, 912 (D.C. Cir. 1982).

36.     Violating the Jones Act is no small matter; penalties include the seizure and forfeiture of merchandise from the vessel.  46 U.S.C. § 55102(c).

37.     The Jones Act applies to commerce between points in the United States to which the "coastwise," or domestic shipping, laws apply.  46 U.S.C. § 55102(b).

38.     "[T]he coastwise laws apply to the United States, including the island territories and possessions of the United States," with limited exceptions for American Samoa, the Northern Mariana Islands, and the Virgin Islands.  46 U.S.C. § 55101.

39.     Section 502(b) of the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America (the "Northern Mariana Islands Covenant") provides that "[t]he laws of the United States regarding coastal shipments . . . will apply to the activities of the United States Government and its contractors in the Northern Mariana Islands."  48 U.S.C. § 1801 note (Northern Mariana Islands Covenant § 502(b)); *see also* 46 U.S.C. § 55101(b)(2); Customs Service Ruling HQ 109583 (July 7, 1988) (discussing service between Guam and Saipan, and noting that "the coastwise laws of the U.S. are applicable in the Northern Mariana Islands only to the activities of the U.S. Government and its contractors").

40.     Trade between any point in the United States or its territories and Guam is domestic.

41.     Trade between any point in the United States or its territories and Saipan is domestic.

42.     Federal contractors operating between points in the United States and the Northern Mariana Islands (including Saipan) are engaged in the coastwise trade.  An MSP contractor is a federal contractor within the meaning of the Northern Mariana Islands Covenant.

43.     A carrier cannot evade the requirements of the coastwise laws, including the Jones Act, by interrupting a voyage between points in the United States with a stop or a transshipment (*i.e.*, a change of vessels) at a foreign port.

44.     Indeed, the Jones Act specifically covers shipping between points in the United States "either directly or *via a foreign port*."  46 U.S.C. § 55102(b) (emphasis added).  "Congress, seeing how easily the protection to American shipping would be vitiated by a simple transshipment of the same cargo, inserted the words 'either directly or via a foreign port' to prohibit such simple transshipment."  *Am. Mar. Ass'n v. Blumenthal*, 590 F.2d 1156, 1165 (D.C. Cir. 1978).

45.     The U.S. Customs and Border Protection ("CBP") was the nation's first comprehensive border security agency, charged with maintaining the integrity of the nation's boundaries and ports of entry.

46.     A CBP regulation provides that "[a] coastwise transportation of merchandise takes place, within the meaning of the coastwise laws, when merchandise laden at a point embraced within the coastwise laws ('coastwise point') is unladen at another coastwise point, regardless of the origin or ultimate destination of the merchandise."  19 C.F.R. § 4.80b(a).

47.     To illustrate, goods originating in Long Beach, California; transported by one vessel to Busan, South Korea; and from there transported by a second vessel to Guam or Saipan constitute a domestic shipment because they originated and terminated at ports in the United States or its territories.

## II.      The Maritime Security Program Promotes U.S. Shipping in Foreign Commerce

48.      The Jones Act protects *domestic* shipping.  "In U.S. foreign commerce, however, such protective legislation is not possible," because the foreign countries with which the United States trades have equal rights to allow their own flagged vessels to carry cargo in such trade. *Indep. U.S. Tanker Owners Comm.*, 690 F.2d at 912.

49.      In order to promote U.S. shipping in foreign commerce and protect U.S.-flagged carriers from the lower construction and labor costs generally enjoyed by foreign carriers, Congress has long authorized subsidies to U.S.-flagged carriers operating in foreign commerce.

50.      For example, in the Merchant Marine Act of 1936, Congress enacted the Construction-Differential Subsidy program ("CDS") and the Operating-Differential Subsidy program ("ODS").  Merchant Marine Act of 1936, 49 Stat. 1985, §§ 501–610 (1936).  For decades, the CDS and ODS programs offset the higher costs of constructing vessels in the United States and employing U.S.-citizen mariners by providing direct subsidies to qualifying carriers that operate in foreign trade.

51.      At the same time, Congress has long prevented subsidized carriers or vessels from engaging in domestic trade, as "[i]t would be grossly unfair to allow U.S. vessels that have received a subsidy . . . to compete with U.S. vessels whose owners paid the full cost of construction in U.S. yards."  *Indep. U.S. Tanker Owners Comm.*, 690 F.2d at 912; *see also* 139 Cong. Rec. H8760 (Nov. 3, 1993) ("Among [the CDS] restrictions is a requirement that subsidized vessels operate exclusively in foreign trade.  This restriction is intended to protect both the operators of unsubsidized vessels in the protected domestic trades and our domestic shipyards that have exclusive right to supply vessels for domestic trades."); *Sea-Land Serv., Inc. v. Dole*, 596 F. Supp. 1143, 1146 (D.D.C. 1984) (describing "the clear statutory intent" of a previous subsidy program

"to protect unsubsidized lines such as plaintiffs here from competition by subsidized lines such as APL on domestic cargo routes").

52.     Limitations on domestic trade for subsidized vessels cannot be evaded by transshipment at a foreign port.

53.     Congress currently subsidizes U.S. carriers engaged in foreign commerce through the MSP.  *See* 46 U.S.C. § 53101 et seq.

54.     Congress created the MSP in the Maritime Security Act of 1996, in order to "meet national defense and other security requirements and maintain a United States presence in *international* commercial shipping."  Pub. L. No. 104-239, § 2 (1996) (now codified at 46 U.S.C. § 53102(a)) (emphasis added).

55.     In creating the MSP, Congress enacted strict eligibility limitations.

56.     Among other things, in order to participate in the MSP, a vessel must "provid[e] transportation in foreign commerce"; be "suitable for use . . . for national defense or military purposes"; and be "commercially viable."  46 U.S.C. § 53102(b)(2), (4).

57.     "Foreign commerce" is defined in the statute as:

(A) commerce or trade between the United States, its territories or possessions, or the District of Columbia, and a foreign country; and

(B) commerce or trade between foreign countries.

46 U.S.C. § 53101(4).

58.     The regulations regarding eligibility for inclusion in the MSP similarly require that a vessel must be "operated or, in the case of a vessel to be purchased or construed, will be operated to provide transportation in the foreign commerce."  46 C.F.R. § 296.11(a)(2).

59.     The regulations define "foreign commerce" as follows:

Foreign commerce means a cargo freight service, including direct and relay service, operated *exclusively* in the foreign trade or in mixed foreign and domestic trade

11

allowed under a registry endorsement under 46 U.S.C. § 12111 where the origination point or the destination point of any cargo carried is the United States, regardless of whether the vessel provides direct service between the United States and a foreign country, or commerce or trade between foreign countries.

46 C.F.R. § 296.2 (emphasis added).

60.    A registry endorsement under 46 U.S.C. § 12111 permits a vessel to engage in "foreign trade or trade with Guam, American Samoa, Wake, Midway, or Kingman Reef," even if that vessel would not otherwise be eligible to operate in coastwise trade.

61.    A vessel must also meet certain age requirements:  If the vessel is a tank vessel, it must be "10 years of age or less on the date the vessel is included in the Fleet," and if it is any other type of vessel, it must be "15 years of age or less on the date the vessel is included in the Fleet."  46 U.S.C. § 53102(b)(3).

62.    Carriers participate in the MSP by entering into "operating agreements" with MARAD for specifically identified vessels.  46 U.S.C. § 53102(a); 46 C.F.R. §§ 296.1, 296.12.

63.    Here too Congress set strict eligibility requirements for MSP operating agreements, requiring that the subsidized vessels "shall be operated exclusively in the foreign commerce or in mixed foreign commerce and domestic trade allowed under a registry endorsement," and that the vessels "shall not otherwise be operated in the coastwise trade."  46 U.S.C. § 53105(a).

64.    The statute requires carriers participating in the MSP, "as a condition of including any vessel in the Fleet," to "enter into an operating agreement with the Secretary under this section."  46 U.S.C. § 53103(a).

65.    Vessels are thus not eligible for an MSP operating agreement, or inclusion in the MSP Fleet, if they are not operated exclusively in the foreign commerce or in mixed foreign commerce and domestic trade allowed under a registry endorsement, or if they are otherwise operated in the coastwise trade.  It is thus a statutory condition of eligibility that, on the date the

vessel is admitted to the MSP Fleet, both the vessel and its operator are in compliance with all material terms of the standardized operating agreement.

66.     The National Defense Authorization Act for Fiscal Year 2018, Pub. L. No. 115-91 (2017), among other things, amended 46 U.S.C. § 53105 to include an additional paragraph regarding the eligibility of vessels to participate in the MSP:

> [I]n the case of a vessel, other than a replacement vessel under subsection (f), first covered by an operating agreement after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2018, the vessel shall not be operated in the transportation of cargo between points in the United States and its territories either directly or via a foreign port . . . .

Pub. L. No. 115-91, § 3503, 131 Stat. 1283, 1911 (2017) (codified at 46 U.S.C. § 53105(a)(2) (2017)).

## FACTUAL ALLEGATIONS

## I.     APL Receives MSP Subsidies for Ships Operating in Domestic Trade

67.     In January 2005, APL was awarded MSP Operating Agreement Nos. MA/MSP-49 to -57, allowing nine of APL's vessels to operate under the MSP.  *See* Ex. 1.*

68.     On December 4, 2014, APL applied to MARAD for a determination that it could replace two vessels under its MSP Operating Agreements with unspecified, smaller vessels.  Ex. 2.  Whereas the existing vessels operated in the Middle East, the proposed replacement vessels would operate in the Pacific Ocean.  *Id.* at 3–4.

---

\* All exhibits to the complaint are from documents from the administrative record provided by MARAD in prior litigation, or provided directly by MARAD in connection with the 2020 Approval Order.  On July 17, 2020, Matson filed a request pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 and 49 C.F.R. § 7, seeking documents related to the administrative proceedings at issue here.  Matson supplemented that request on August 7, 2020 with requests for additional documents and the full administrative record.  MARAD has produced some documents in response to those requests, but its production is not yet complete.  Matson may amend its complaint after MARAD completes its FOIA production and any disputes regarding redactions have been resolved.

69.     In its initial application, APL indicated that it would operate at least one of the replacement vessels in service to Guam—a service APL had not offered for nearly two decades. Ex. 2, at 5–6.

70.     APL did not make any representations about transportation of cargo originating in the United States or its territories to Saipan (a U.S. territory in the Mariana Islands), or transportation of cargo originating in Saipan to other parts of the United States.  Ex. 2.

71.     APL argued that although the carriage of cargo between the continental United States and Guam constitutes domestic trade, this did not make it ineligible for MSP subsidies because "MSP vessels may be operated in mixed foreign commerce and domestic trade allowed under a registry endorsement," and Guam is among the ports authorized to be called under a registry endorsement.  Ex. 2, at 5.

72.     Unlike Guam, Saipan is not among the ports listed in 46 U.S.C. § 12111 that may be called under a registry endorsement.

73.     MARAD approved APL's initial application in principle in January 2015.  Ex. 3, at 1–2.

A.      **MARAD Approves the APL GUAM for the MSP**

74.     On August 27, 2015, APL represented to MARAD that it had located a suitable and qualified replacement for one of its existing MSP vessels.  APL proposed to substitute in a vessel then known as the NEW DYNAMIC and requested a determination that the NEW DYNAMIC was eligible under MSP and was an acceptable replacement vessel for one of APL's existing MSP vessels.  Ex. 4.

75.     APL indicated that the replacement vessel would carry cargo to and from Guam, but made no representations about, or reference to, the vessel's anticipated transportation of domestic cargo to or from Saipan.

76.     On September 11, 2015, MARAD determined that the NEW DYNAMIC was eligible for the MSP.   MARAD stated that it had "determined that the Vessel meets the requirements of 46 U.S.C. § 53102(b) and 46 C.F.R. § 296.11," but offered no examination of the requirements for eligibility, including whether the vessel would be engaged in foreign commerce within the meaning of the statute and the regulations.  Ex. 5, at 1.

77.     On September 16, 2015, APL requested formal approval to replace one of its MSP vessels (the APL CYPRINE) with the NEW DYNAMIC, which would be renamed the APL GUAM, under MSP Operating Agreement No. MA/MSP-54.  Ex. 6.

78.      The APL GUAM was intended to carry cargo originating from the United States west coast, operating in service between Yokohama, Japan; Busan, South Korea; Guam; and Saipan, in the Northern Mariana Islands.  Ex. 7, at 2.

79.     On October 22, 2015, MARAD issued a letter to APL approving the substitution of the APL GUAM in place of the APL CYPRINE.  Ex. 8.

80.     The letter included no discussion of the APL GUAM's anticipated transportation of cargo originating in the United States or its territories to Saipan, or transportation of cargo originating in Saipan to other parts of the United States.

81.     Matson was not given formal notice of APL's application to substitute the APL GUAM for the APL CYPRINE, nor was it given an opportunity to participate in the administrative proceedings approving the subsidy award.

B.      **MARAD Approves the APL SAIPAN for the MSP**

82.      On August 24, 2016, APL sought approval in principle to replace a second of its

MSP vessels with another vessel to be operated "alongside the APL GUAM in APL's existing US-

flag service of Guam and Saipan via Korea." Ex. 9, at 1.

83.      APL represented to MARAD:

(iii)      In implementation of the authority granted in your January 20, 2015 letter,
and the Administration[']s subsequent determination that the APL GUAM meets
the MSP eligibility requirements, effective December 2015, APL initiated its
planned feeder service to Guam and Saipan with that vessel, replacing a second of
the S12s (the APL Cyprine) under Operating Agreement No. MA/MSP 54.

Ex. 9, at 3.

84.      On October 11, 2016, APL supplemented its August 24, 2016 application,

representing that it had identified a vessel, the ELISA ELMAS, suitable for substitution in place

of an existing MSP vessel. Ex. 10.

85.      APL represented that the ELISA ELMAS was "ideally suited to the APL

Guam/Saipan service." Ex. 10, at 1.  APL contended that there was "no question that the vessel

[met] the eligibility standards of 46 U.S.C. [§] 53102(b)," because, among other things, it would

"be operated in foreign commerce." *Id.* at 2.

86.      APL represented that the ELISA ELMAS would operate under MSP Operating

Agreement No. MA/MSP-57. Ex. 10.

87.      On November 9, 2016, MARAD responded to APL's August 24, 2016 application

and approved the substitution in principle, provided the substituted vessel met all MSP eligibility

requirements. Ex. 11.  MARAD did not address whether the substituted vessel would operate in

foreign commerce.

88.      On November 15, 2016, MARAD responded to APL's October 11, 2016

application and determined that the ELISA ELMAS met the requirements of 46 U.S.C. § 53102(b)

and 46 C.F.R. § 296.11.  Ex. 12.  MARAD did not otherwise discuss the issue of whether the

ELISA ELMAS would operate in foreign commerce.

89.     On December 9, 2016, an internal memorandum was circulated within MARAD

recommending that MARAD formally approve APL's request to substitute the ELISA ELMAS,

to be renamed the APL SAIPAN, in place of the APL AGATE.  Ex. 13.

90.     With respect to the statutory requirement that an MSP vessel operate in foreign

commerce, the memorandum stated:

> 46 U.S.C. § 53102(b)(2), further clarified by 46 U.S.C. § 53105(a)(1)(A) requires
> that an eligible vessel be operated exclusively in the foreign commerce or in mixed
> foreign commerce and domestic trade allowed under a registry endorsement issued
> under section 12111 of title 46, United States Code.  Under 46 U.S.C. § 12111(b),
> a registry endorsement entitles a U.S. operator to engage in foreign trade or
> domestic trade with Guam, American Samoa, Wake, Midway or Kingman Reef.
> APL will time charter the Replacement Vessel from APLMS for operation in its
> established worldwide services, with mixed foreign commerce and domestic trade
> to Guam provided in accordance with the Replacement Vessel's registry
> endorsement.  Accordingly, it has been determined that the Replacement Vessel
> will provide transportation in foreign commerce, thereby meeting the requirements
> of 46 U.S.C. § 53102(b)(2).

Ex. 13, at 4.

91.     With respect to the regulatory eligibility requirements, the memorandum stated:

"46 C.F.R. § 296.11(a) implements 46 U.S.C. § 53102(b).  The requirements and qualifications of

Section 53102(b) have previously been discussed and have been determined to be satisfied."  Ex.

13, at 7.

92.     The memorandum recommended that MARAD:

(C)     Note that APLMS will time charter the Replacement Vessel to American
President Line, Ltd. (APL), a Delaware corporation and U.S. documentation
citizen, for operation in APL's established world-wide services, with mixed foreign
commerce and domestic trade to Guam provided in accordance with the
Replacement Vessel's registry endorsement.

(D)     In view of (C) above, find that the Replacement Vessel will provide
transportation in foreign commerce or in mixed foreign commerce and domestic

trade allowed under a registry endorsement issued under 46 U.S.C. § 12111, pursuant to the requirement of 46 U.S.C. §§ 53102(b)(2) and 53105(a)(1)(A).

Ex. 13, at 12–13.

93.     The memorandum included no discussion about the APL SAIPAN's anticipated transportation of cargo originating in the United States or its territories to Saipan, or transportation of cargo originating in Saipan to other parts of the United States.

94.     MARAD adopted those recommendations, and on December 20, 2016, issued the 2016 Approval Order approving the substitution of the APL SAIPAN in place of the APL AGATE. Ex. 14.

95.     In approving APL's request, MARAD made the following determinations regarding the APL SAIPAN's compliance with the statutory eligibility requirements:

(C)     Noted that APLMS will time charter the Replacement Vessel to American President Line, Ltd. (APL), a Delaware corporation and U.S. documentation citizen, for operation, in APL's established world-wide services, with mixed foreign commerce and domestic trade to Guam provided in accordance with the Replacement Vessel's registry endorsement:

(D)     In view of (C) above, found that the Replacement Vessel will provide transportation in foreign commerce or in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under 46 U.S.C. § 12111, pursuant to the requirement of 46 U.S.C. §§ 53102(b)(2) and 53105(a)(1)(A).

Ex. 14, at 1–2.

96.     In approving APL's request, MARAD made the following determination regarding the APL SAIPAN's compliance with the regulatory eligibility requirement:

(K)     Noted that (1) Section 296.11(a) implements 46 U.S.C. § 53102(b); (2) found the requirements and qualifications of Section 53102(b) have been determined to be satisfied; and (3) found that the requirements of Section 296.11(a) have been satisfied and that approval by the Secretary in conjunction with SecDef has been determined to have been satisfied.

Ex. 14, at 2.

97.     The letter included no discussion about the APL SAIPAN's anticipated transportation of cargo originating in the United States or its territories to Saipan, or transportation of cargo originating in Saipan to other parts of the United States.  In fact, with the exception of the vessel's name, the letter contained no discussion of Saipan at all.

98.     MARAD knew or should have known at that time that the APL SAIPAN would offer service to and from Saipan.

99.     On October 12, 2015, APL issued a press release announcing its new service to and from Guam and Saipan, called the "Guam Saipan Express" or "GSX."  Ex. 15.  APL advertised that the service would give "Saipan shippers an alternative for shipping from the U.S. mainland." *Id.*

100.     Around the same time, Eric Mensing, the President of APL Marine Services, Ltd. and APL Maritime, Ltd., told a newspaper, The Guam Daily Post, that the addition of the Guam Saipan Express would let "Saipan shippers 'tap into APL's global service network for freight to and from many parts of the world.'"  Ex. 16, at 3.

101.     The APL SAIPAN in fact carries cargo originating from the United States west coast, and operates in service between Yokohama, Japan; Busan, South Korea; Guam; and Saipan, in the Northern Mariana Islands.  Ex. 7, at 2.

102.     When APL announced the addition of the APL SAIPAN to its service to Guam, APL's General Manager for Guam and Micronesia, John Selleck, explained that "[t]he more frequent GSX service will speed up essential cargo shipments from the U.S. mainland to the islands."  Ex. 17.

103.     APL advertised its expanded GSX service in a brochure highlighting the "[w]eekly Priority I U.S. flag service departures from the U.S. West Coast ports to Guam."  Ex. 7, at 2.

104.    Although neither MARAD nor APL formally notified Matson of the application to approve the APL SAIPAN as a subsidized replacement vessel, Matson wrote to MARAD on December 12 and 15, 2016, setting forth certain reasons why APL's vessels providing service to Guam and Saipan should not be included in the MSP.  Exs. 18–19.  MARAD did not acknowledge or address Matson's objections in its letter approving the APL SAIPAN for inclusion in the MSP.

### C.    Initial Litigation Regarding Eligibility

105.    Following MARAD's formal approval of the APL SAIPAN, Matson attempted to challenge the approvals of both the APL GUAM and the APL SAIPAN by administrative appeal on February 17, 2017.

106.    On April 7, 2017, MARAD rejected the administrative appeal on the ground that Matson lacked standing under 46 C.F.R. § 296.50(a) because it is not a "Contractor" within the meaning of the operative regulations.  Ex. 20, at 1.

107.    Although MARAD concluded that Matson lacked standing, it nonetheless discussed the merits of the administrative appeal as well.

108.    MARAD found that the "relevant language in the [Maritime Security Act] could not be clearer regarding APL's ability to operate in the Guam trade," and cited 46 U.S.C. § 53105(a)(1)(A) in support, saying that because domestic trade with Guam under a registry endorsement "as provided in section 53105(a)(1)(A)" is permitted in the MSP, the replacement vessels were eligible to participate in the MSP.  Ex. 20, at 1–2.

109.    MARAD also dismissed Matson's argument that the replacement vessels' transport of cargo originating in and destined for the United States made them ineligible for the MSP.  Ex. 20, at 2.

110.    MARAD did not discuss or acknowledge the replacement vessels' transport of cargo to and from Saipan.

111.    Matson petitioned for review of MARAD's appeal determination in the United States Court of Appeals for the D.C. Circuit.  APL intervened.  Both MARAD and APL argued that the Court of Appeals lacked jurisdiction to hear Matson's appeal and that the case should be brought instead in district court.  After briefing, argument, and supplemental briefing, the Court of Appeals dismissed the appeal for lack of jurisdiction.  *See* Ex. 21.

### D.    Previous District Court Litigation

112.    Following the dismissal in the D.C. Circuit, Matson filed suit in this Court challenging the approvals of both the APL GUAM and the APL SAIPAN.

113.    Matson argued principally that the vessels were ineligible for inclusion in the MSP because they each provided transportation in domestic commerce of goods to and from Saipan, which is domestic trade not permitted under a registry endorsement under 46 U.S.C. § 12111.

114.    APL intervened in those proceedings.

115.    Both MARAD and APL argued that the requirement that an MSP vessel operate exclusively in foreign commerce or mixed foreign and domestic commerce conducted pursuant to a registry endorsement under 46 U.S.C. § 12111 did not go to the *eligibility* of the vessels, but only to their obligations under the operating agreements once accepted into the MSP.

116.    MARAD and APL therefore argued that a vessel may be eligible to join the MSP, but not able to thereafter operate in the MSP and receive subsidies.

117.    MARAD and APL also argued that although the Northern Mariana Islands Covenant rendered the coastwise laws applicable to domestic trade to and from Saipan for the

activities of the United States Government and its contractors in the Northern Mariana Islands, APL is not a government contractor for purposes of the Northern Mariana Islands Covenant.

118.    APL additionally argued that a Coast Guard regulation, 46 C.F.R. § 67.17, extended the coverage of a registry endorsement under 46 U.S.C. § 12111 to trade to and from Saipan.

119.    MARAD did not join APL's argument regarding 46 C.F.R. § 67.17.

120.    On May 30, 2020, the Court issued a Memorandum Opinion holding that it lacked jurisdiction over Matson's challenge to the approval of the APL GUAM, but holding that the 2016 Approval was issued in violation of the APA.

121.    The Court issued an Amended Memorandum Opinion on June 12, 2020.  Ex. 22.

122.    With respect to the APL GUAM, the Court held that pursuant to the Hobbs Act, 28 U.S.C. § 2342, the federal courts of appeals had exclusive jurisdiction over any challenge to the approval order.  The Court reasoned that because MARAD had cited 46 U.S.C. § 50501 in its approval order of the APL GUAM, and because 46 U.S.C. § 50501 is a statute listed in the Hobbs Act as requiring review in the D.C. Circuit, jurisdiction was exclusively in the federal courts of appeals.  Ex. 22, at 17–18.

123.    With respect to the APL SAIPAN, the Court held that it could not "discern the basis for MARAD's 2016 determination respecting the APL Saipan and, in particular, [could not] discern whether the agency (1) construed the statute to permit an MSP contractor to replace an MSP vessel with another vessel, so long as that vessel operates at least in part in foreign commerce; (2) failed to consider the fact that the APL Saipan might not operate exclusively in foreign or mixed foreign and domestic trade due to its service to Saipan; or (3) concluded that the APL Saipan operates under a registry endorsement under 46 U.S.C. § 12111 that permits it to engage in trade between Saipan and the coastal United States."  Ex. 22, at 2–3.

124.    "As a result," the Court continued, "the agency either completely failed to explain its reasons for approving the replacement or entirely failed to consider an important aspect of the question before it and thus failed to comply with the APA."  Ex. 22, at 3.

125.    With respect to the appropriate remedy, the Court invited "additional evidence and briefing on whether the Court should remand the matter with or without vacatur."  Ex. 22, at 34.

126.    MARAD submitted its supplemental brief on June 5, 2020, and included a declaration from William G. McDonald, the Director of MARAD's Office of Sealift Support since 2015.

127.    Director McDonald explained that were the Court to vacate the 2016 approval of the APL SAIPAN, that "would mean that the vessel would no longer be subject to the MSP Operating Agreement, and would no longer be required to be maintained in active service."  Ex. 23 ¶ 4.

128.    Director McDonald went on to explain that in 2016, "MARAD amended all 60 of its MSP Operating Agreements to expressly require 'heel to toe' vessel replacement.  That is, MARAD will not allow a current MSP vessel to be replaced, and thus leave the fleet, until the contractor has a replacement vessel approved by MARAD and USTRANSCOM that is ready to begin operating."  Ex. 23 ¶ 6.

129.    On June 30, 2020, the Court issued an opinion concluding that "vacatur is warranted."  Ex. 24, at 2.

130.    In reaching that determination, the Court stated that it "agree[d] with Matson that MARAD's approval order was seriously deficient and further conclude[d] that there is considerable 'doubt whether the agency chose correctly.'"  Ex. 24, at 4.  "The errors in this," the

Court continued, "are fundamental, and the Court is left with substantial doubt that MARAD reached the correct decision." *Id.*

131.    The Court continued:  "To conclude on remand that the APL Saipan qualifies as a replacement vessel MARAD will need to do one of two things: either it will need to explain away its prior assertion that . . . the statute 'requires that an eligible vessel be operated exclusively in the foreign commerce or in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under section 12111,' or it will need to adopt APL's alternative argument, which neither MARAD nor its counsel has previously embraced, that a Coast Guard regulation permits vessels in mixed foreign commerce and domestic trade to provide service to Saipan under a registry endorsement issued under 46 U.S.C. § 12111."  Ex. 24, at 4–5 (citations omitted).

132.    The Court further stated that "[i]n seeking approval of the APL Saipan as a replacement vessel on remand, APL will, at best, start from a blank slate and, if unsuccessful in pressing its alternative theory, APL will need to convince MARAD that the above-quoted language included in its 2016 memorandum was mistaken."  Ex. 24, at 5.

133.    On July 17, 2020, Matson filed a timely appeal from the portion of the Court's order finding that it lacked jurisdiction to consider Matson's challenge to the approval of the APL SAIPAN.

134.    In an abundance of caution, Matson also filed a motion to certify the Court's jurisdictional order for interlocutory appeal.

135.    The Court thereafter solicited supplemental briefing on whether its jurisdictional order could be certified as a partial final judgment pursuant to Fed. R. Civ. P. 54(b).  Matson and MARAD filed supplemental briefs agreeing that such certification was appropriate.  APL opposed certification on the ground that the initial notice of appeal was adequate.

136.    On August 19, 2020, the Court issued an order certifying its jurisdictional order as a partial final judgment pursuant to Fed. R. Civ. P. 54(b).  Matson filed a timely notice of appeal, and that appeal was consolidated with the first appeal.

### E.    Remand Proceedings

137.    Following vacatur of MARAD's 2016 approval of the APL SAIPAN, neither MARAD nor APL advised Matson of whether or when remand proceedings before the agency would begin.

138.    On July 2, 2020, counsel for Matson sent an email to counsel for MARAD and counsel for APL, advising both that Matson "intends to participate in the administrative proceedings regarding the APL SAIPAN on remand from the district court, and expects timely notice (from both MARAD and APL) of material developments in the proceedings as well as an opportunity to be heard before MARAD takes any final action on remand."  Ex. 25.

139.    Counsel for Matson further advised that "[i]f you or your respective clients have any objection to Matson's participation, please let me know immediately, in writing, including the bases therefor.  Otherwise, please promptly confirm, in writing, that you will ensure that Matson receives timely copies of any submissions, applications, correspondence or other communications regarding the eligibility of the APL SAIPAN for the MSP Fleet."  Ex. 25.

140.    Counsel for APL responded telephonically that Matson had no right to participate in the administrative proceedings and that APL did not intend to provide any documents or correspondence to Matson.  Counsel for Matson asked counsel for APL to put APL's position in writing, and counsel for APL refused.

141.    MARAD's litigation counsel at the Department of Justice indicated it would forward Matson's request to agency counsel.

142.    On Thursday, July 9, 2020, MARAD's Lead Attorney for Maritime Support Programs advised counsel for Matson that "[r]equests to approve a participant's vessel as a replacement in the Maritime Security Fleet, of which there have been dozens, have always been handled as informal matters between MARAD, in consultation with the U.S. Transportation Command, and the requesting MSP participant.  MARAD intends to follow what has for years been its normal administrative practice in this matter."  Ex. 26.

143.    MARAD's counsel further advised:  "Matson, of course, is always free to present whatever views it may have on this matter, or any of the various programs and matters with which MARAD is concerned.  If Matson would like to submit it[s] views on this matter, I would suggest that it do so by the close of business on Monday July 13."  Ex. 26.

144.    Matson was not provided with any submissions made by APL on remand, and was given just four calendar days to prepare its submission.

145.    On July 13, Matson submitted to MARAD a letter outlining several reasons why the APL SAIPAN could not be approved for inclusion in the MSP.  Ex. 27.

146.    At the outset of its argument, Matson reiterated the Court's statement that "[i]n seeking approval of the APL SAIPAN as a replacement vessel on remand, APL will, at best, *start from a blank slate* and, if unsuccessful in pressing its alternate theory, APL will need to convince MARAD that the . . . language included in its 2016 memorandum was mistaken."  Ex. 27, at 28 (quotation marks omitted).

147.    Matson explained that "[t]he court's rulings recognize that under the statutory construction announced in MARAD's 2016 order, *the APL SAIPAN is ineligible for the Fleet*.  To approve APL's application on remand, MARAD would have to *change* its position about what the statute means."  Ex. 27, at 28.

148.    Matson further explained that because the Court had *vacated* the prior approval of the APL SAIPAN, "MARAD cannot discharge its obligations under the MSA by limiting its review to the issues raised by the court's summary judgment order, or even the issues addressed in this letter."  Rather, "MARAD must make *all* appropriate statutory and regulatory findings in evaluating the APL SAIPAN for inclusion in the MSP."  Ex. 27, at 28 n.4.

149.    Matson then discussed each of the reasons why the APL SAIPAN is ineligible for inclusion in the MSP fleet.

150.    *First*, Matson argued that domestic trade with Saipan renders the APL SAIPAN ineligible for the MSP fleet,

151.    Matson first cited the Court's vacatur order, which explained:

> To conclude on remand that the APL Saipan qualifies as a replacement vessel MARAD will need to do one of two things:  either it will need to explain away its prior assertion that the statute "requires that an eligible vessel be operated exclusively in the foreign commerce or in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under section 12111," or it will need to adopt APL's alternative argument, which neither MARAD nor its counsel has previously embraced, that a Coast Guard regulation permits vessels in mixed foreign commerce and domestic trade to provide service to Saipan under a registry endorsement issued under 46 U.S.C. 12111

Ex. 27, at 28.

152.    The Court's allusion to MARAD's "prior assertion" refers to a statement in the staff memorandum supporting the 2016 Approval Order, in which MARAD staff stated:

> 46 U.S.C. § 53102(b)(2), *further clarified by* 46 U.S.C. § 53105(a)(1)(A) requires that an eligible vessel be operated exclusively in the foreign commerce or in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under section 12111 of title 46, United States Code.

Ex. 13, at 4 (emphasis added).

153.    In the 2016 Approval Order itself, MARAD "found" that the APL SAIPAN would "provide transportation in foreign commerce or in mixed foreign commerce and domestic trade

allowed under a registry endorsement issued under 46 U.S.C. § 12111, pursuant to the requirement of 46 U.S.C. §§ 53102(b)(2) and 53105(a)(1)(A)." Ex. 14, at 1–2.

154.   Matson pointed out that if this same criterion is applied to the APL SAIPAN's domestic carriage to Saipan, then the APL SAIPAN is, by MARAD's reasoning, ineligible for inclusion in the MSP Fleet.

155.   The reason for this is because trade to and from Saipan is domestic trade not covered by a registry endorsement under 46 U.S.C. § 12111, and therefore prohibited by 46 U.S.C. § 53105(a)(1)(A).

156.   Matson addressed the argument that Section 53105(a)(1)(A), requiring exclusive operation in foreign commerce and mixed permissible domestic trade, applies only to the operation of vessels in the MSP Fleet, and not to their eligibility for inclusion in the MSP Fleet.  Matson explained that this "is not a reasonable interpretation of the statute" because the MSA "itself links eligibility and operations."  Ex. 27, at 33.  Specifically, 46 U.S.C. § 53103(a) provides that the Secretary of Transportation "shall require, as a condition of including any vessel in the Fleet, that the person that is the owner or operator of the vessel . . . enter into an operating agreement under this section.

157.   A vessel thus cannot be included in the Fleet unless it can comply with the terms of a standardized operating agreement, including the requirement of exclusive foreign commerce and permissible domestic trade.

158.   Matson further explained that "[i]t would make no sense to say that Section 53105(a)(1)'s limitation on domestic trade bears no relation to Section 53102(b)(2)'s eligibility requirement regarding foreign commerce," because "[s]uch a reading would make a vessel eligible for the MSP simply if it carried a single container of cargo in foreign commerce at some point

during its operation, yet that same vessel could not actually operate under an MSP operating agreement." Ex. 27, at 33–34.

159.    Matson additionally explained that domestic trade to and from Saipan is likewise prohibited under MARAD's own regulations, which expressly require that for a vessel to be eligible for inclusion in the MSP Fleet, the vessel must be operated in "foreign commerce." 46 C.F.R. § 296.11(a)(2).

160.    MARAD's regulations define "foreign commerce" to mean "a cargo freight service . . . operated *exclusively* in the foreign trade or in mixed foreign and domestic trade allowed under a registry endorsement under 46 U.S.C. [§] 12111." 46 C.F.R. § 296.2 (emphasis added).

161.    Inserting the regulatory definition of "foreign commerce" into 46 C.F.R. § 296.11(a)(2) makes clear that under MARAD's own regulations, a vessel is not *eligible* for inclusion in the MSP Fleet unless it operates "exclusively in the foreign trade or mixed foreign and domestic trade allowed under a registry endorsement under 46 U.S.C. [§] 12111."

162.    Matson addressed MARAD's argument, made in the prior litigation, that because the statutory definition of foreign commerce is purportedly broader than the regulatory definition, the statutory definition controls.

163.    Matson explained that that "contention is wrong as a matter of statutory construction," and also that "this backwards assertion turns the ordinary process of statutory construction and rulemaking on its head." Ex. 27, at 36.

164.    Matson stated that because "[n]o vessel is entitled to participate in the MSP," MARAD is therefore free to "impose additional restrictions beyond those contemplated by the statute, and, in fact, did so through the implementation of regulations." Ex. 27, at 36.

165.    Matson next argued that the exclusive list of territories in 46 U.S.C. § 12111 for which a registry endorsement may be obtained is not augmented, for MSP purposes, by a Coast Guard regulation that provides:  "A registry endorsement entitles a vessel to employment in the foreign trade; trade with Guam, American Samoa, Wake, Midway, or Kingman Reef; *and any other employment for which a coastwise, or fishery endorsement is not required*."  46 C.F.R. § 67.17(a) (emphasis added).

166.    Matson explained that whatever effect the regulation has on the Coast Guard's operations, "it cannot and does not alter the plain text of Section 53105(a)(1)(A) and Section 12111(b)."  Ex. 27, at 39.  The statute expressly references 46 U.S.C. § 12111(b), which sets forth a discrete and exclusive list of territories to which trade is permitted under a registry endorsement.

167.    Whatever authority the Coast Guard has to promulgate regulations as to matters under its purview and control, the Coast Guard has "*no* authority over the interpretation or administration of the MSP," and thus the regulation "cannot alter what the *statute* says about the ability of MSP vessels to operate in domestic commerce."  Ex. 27, at 39.

168.    Matson further explained that even if the Coast Guard regulation could apply, domestic trade to and from Saipan by an MSP contractor is necessarily "coastwise" trade—and therefore impermissible even under the Coast Guard regulation—because pursuant to the Northern Mariana Islands Covenant, the coastwise laws apply to the "activities of the United States government *and its contractors* in the Northern Mariana Islands."  48 U.S.C. § 1801 note (emphasis added).

169.    All MSP operators, including APL, must enter into a contract with the United States in order to receive subsidies under the MSP.

170.     The APL SAIPAN's carriage to Saipan is necessarily conducted pursuant to its contract with the United States, because the vessel must be *operated* in accordance with an MSP operating agreement—a contract with the United States—in order to obtain subsidies at all.

171.     Every time the APL SAIPAN calls Saipan, then, it is under contract with the United States government regardless of what cargo (if any) it is carrying.

172.     Matson explained that the Northern Mariana Islands Covenant cannot be read to apply the coastwise laws only to the shipment of government *cargo* to and from Saipan, because that was the scope of the Covenant as originally drafted, but which was revised in the final version to be more expansive.

173.     *Second*, Matson explained that the APL SAIPAN is ineligible for inclusion in the MSP fleet because it exceeds the age requirements.

174.     Containerships seeking to join the MSP must be "15 years of age or less on the date the vessel is included in the Fleet." 46 U.S.C. § 53102(b)(3)(B); 46 C.F.R. § 296.11(a)(3)(ii).

175.     The APL SAIPAN was built in 2002, and at the time of Matson's submission, was more than 15 years old.

176.     Although the statute and regulations permit the Secretary of Defense and Secretary of Transportation to jointly waive the age restriction if certain findings are made, Matson explained that it was aware of no situation in which the Secretaries had issued an age waiver, and that there were no facts to justify a waiver here.

177.     Matson further explained that the 2016 Approval Order "does not change the analysis." That is because that "order was vacated," and a "judicial order of vacatur has the effect of 'reinstating' the regime previously in force." Thus, "the APL SAIPAN was never part of the

Fleet, and its age for eligibility purposes is measured as of '*the date the vessel is included in the Fleet.*'"  Ex. 27, at 44.

178.    *Third*, Matson explained that due to the amendment of the MSA in 2018, new MSP vessels are categorically prohibited from engaging in domestic trade, regardless of whether the vessel has a registry endorsement for the relevant territories.

179.    The National Defense Authorization for Fiscal Year 2018 amended the MSA to provide:

> [I]n the case of a vessel, other than a replacement vessel under subsection (f), first covered by an operating agreement after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2018, the vessel shall not be operated in the transportation of cargo between points in the United States and its territories either directly or via a foreign port[.]

46 U.S.C. § 53105(a)(2).

180.    The National Defense Authorization Act for Fiscal Year 2018 was enacted on December 17, 2017.

181.    Matson argued that because the prior approval of the APL SAIPAN had been vacated, if the APL SAIPAN were approved for the MSP Fleet on remand, it would be "first covered by an operating agreement after" December 17, 2017, and therefore categorically prohibited from domestic trade unless it qualified as a "replacement vessel under subsection (f)."

182.    Matson explained that the APL SAIPAN cannot be a replacement vessel under 46 U.S.C. § 53105(f) because the vessel it would purport to replace—the APL AGATE—has been out of service for over three years.

183.    Matson also argued that this "commonsense interpretation" is confirmed by the fact that according to the Director of MARAD's Office of Sealift Support, MSP operating agreements expressly require "'heel to toe' vessel replacement," meaning that "MARAD will not allow a current MSP vessel to be replaced, and thus leave the fleet, until the contractor has a replacement

vessel approved by MARAD and USTRANSCOM that is ready to begin operating."  Ex. 27, at 45.

184.    Matson further explained that "[i]t makes no difference that the APL SAIPAN was originally proposed as a replacement vessel *nearly four years ago*."  Ex. 27, at 46.  Because the 2016 Approval Order was vacated, "it is the circumstances *now*, not four years ago, that must be examined to determine the APL SAIPAN's eligibility for inclusion in the MSP."  *Id.*

185.    Separate from the numerous reasons for the APL SAIPAN's ineligibility for inclusion in the MSP, Matson argued also that even if the APL SAIPAN is eligible for participation in the MSP, it would be arbitrary and capricious for MARAD to approve a vessel for the MSP that could not actually fulfill the terms of an MSP operating agreement:  "There is no reasoned basis on which MARAD may approve for inclusion in the MSP Fleet a vessel that, even if technically eligible (it is not), has not complied with its operating agreement for the past three years, and cannot comply with its operating agreement going forward."  Ex. 27, at 47.

186.    Matson further argued that because the prior approval order had been vacated, APL was required to return all previously paid subsidies for the operation of the APL SAIPAN.

187.    Additionally, Matson explained that APL could not prospectively fulfill its requirement under the MSP operating agreement to operate the APL SAIPAN exclusively in foreign trade or authorized mixed foreign and domestic trade, and thus could not be awarded any subsidies.

188.    In addition to its substantive arguments, Matson also raised procedural objections. It noted that the first notice it had of any administrative proceedings on remand was in an article in a trade publication, in which an APL spokeswoman said that "APL is committed to working

with MarAd to reinstate the APL Saipan in the MSP programme as quickly as possible."  Ex. 27, at 26 (quotation marks omitted).

189.    Matson further argued that it had a legal right under the APA to participate in an agency proceeding in which it has an interest, *see* 5 U.S.C. § 555(b), and that it has a similar right under MARAD's regulations, *see* 46 C.F.R. § 201.78.

190.    Matson contended that its procedural rights had been violated because it had not been given any visibility into the ongoing proceedings, including being advised whether APL had even resubmitted the APL SAIPAN for approval.

191.    In addition to its written submission, Matson also filed a formal Petition to Intervene, incorporating the procedural arguments it made in its written submission regarding its inability to participate.  Ex. 28.

**F.    Decision on Remand**

**1.    Denial of Petition to Intervene**

192.    On August 3, 2020, MARAD sent counsel for Matson a letter denying Matson's Petition to Intervene.  Ex. 29.

193.    The letter stated that MARAD "has always handled requests by a participant in the Maritime Security Program to approve a vessel as a replacement in the Maritime Security Fleet as informal matters between MARAD, in consultation with the U.S. Transportation Command, and the requesting MSP participant."  Ex. 29.

194.    The letter went on the state that "[n]either MARAD's rules, nor the Administrative Procedure Act, provide a right to a third-party to 'intervene' or otherwise participate as a matter of right in this type of informal matter.  MARAD will not break with its past practice and procedure on MSP vessel replacements by converting this matter into a formal adversarial adjudication."  Ex. 29.

195.    The letter did not address 5 U.S.C. § 555(b) or 46 C.F.R. § 201.78, each of which were cited in Matson's written submission and incorporated by reference into its Petition to Intervene.

### 2.    Issuance of the 2020 Approval Order

196.    On August 4, 2020, MARAD sent counsel for Matson the 2020 Approval Order, dated August 3, 2020, approving the APL SAIPAN for inclusion in the MSP.

197.    The 2020 Approval Order was memorialized in a single-page letter.

198.    The 2020 Approval Order stated:   "As reflected in the attached Memoranda, MARAD has thoroughly considered this matter consistent with the Court's Memorandum Opinion and Order.  Based on this review, I hereby reinstate the APL SAIPAN as a replacement vessel for continued operation under MSP."  Ex. 30, at 1.

199.    The 2020 Approval Order next "not[ed], as explained in the attached Memoranda, that the APL SAIPAN, a vessel documented with a registry endorsement, may, under 46 U.S.C. § 12111 as interpreted by the Coast Guard at 46 C.F.R. § 67.17, trade with Guam and Saipan." Ex. 30, at 1.

200.    The 2020 Approval Order continued:

However, with respect to operations in Saipan, while the coastwise laws generally do not apply to the Commonwealth of the Northern Mariana Islands (CNMI), our review of the Covenant To Establish a Commonwealth of The Northern Mariana Islands in Political Union with the United States of America (Covenant) indicates that: 1) *commercial cargo* may be transported between U.S. ports and the CNMI on U.S.-flag vessels such as the APL SAIPAN with registry endorsements; and 2) the carriage of *U.S. Government cargo* between U.S. ports and the CNMI must be undertaken on U.S.-flag vessels to coastwise endorsements.

Ex. 30, at 1.

201.    The 2020 Approval Order further stated that "[g]iven the APL SAIPAN's area of operation and the issues that have emerged during the course of this matter, I want to note that if

the vessel engages in coastwise trade, APL's invoices should reflect the days that it does so." Ex. 30, at 1.

### 3.    The Staff Memorandum

202.    The Staff Memorandum referenced in the 2020 Approval Order was issued on July 31, 2020, and recounts the procedural history of the application and approval of the APL SAIPAN.

203.    The Staff Memorandum states that "[i]n considering this matter on remand, MARAD has requested information from APL pertaining to the APL SAIPAN's operations with respect to movement of commercial cargo and military cargo between the United States and the CNMI.  In response, APL has informed MARAD that it carries commercial cargo moving between Saipan and ports in the Continental United States, and intends to continue to do so."  Ex. 31, at 5–6.

204.    The Staff Memorandum further states that "[b]ecause the issues for which the Court remanded are largely legal, this Memorandum relies on the Memorandum of the Office of Chief Counsel attached hereto."  Ex. 31, at 6.

205.    With respect to 46 U.S.C. § 53102(b)(2), the Staff Memorandum states that "[t]his was the only eligibility criteria challenged by Matson and addressed by the Court."  Ex. 31, at 7.

206.    The Staff Memorandum further states that "[t]he Office of Chief Counsel has confirmed that this provision requires that, to be eligible to be included in the Fleet, a vessel must engage in foreign commerce, but need not engage *exclusively* in foreign commerce."  Ex. 31, at 7.

207.    With respect to MARAD's regulations, the Staff Memorandum states that "[t]he Office of Chief Counsel has explained that the regulatory criterion must be consistent with the statute, and advised that in considering eligibility, the regulation be interpreted to apply the statutory definition of foreign commerce."  Ex. 31, at 8.

208.    Next, the Staff Memorandum states that "[t]he Office of Chief Counsel has noted the possibility that the Court might disagree with MARAD's interpretation of section 53102(b)(2), as set forth above, and has advised that further consideration of issues regarding MSP vessels trading with the CNMI will facilitate any Court review of MARAD's disposition should Matson again seek judicial review.  This principally involves legal issues."  Ex. 31, at 8–9.

209.    The Staff Memorandum further states that "[t]he Office of Chief Counsel has analyzed the issues related to Matson's proposed interpretation of section 53102(b)(2) and determined that a vessel in the Fleet may engage in trade in commercial cargo with the CNMI. The Office of Chief Counsel has also determined, however, that . . . a U.S.-flag vessel may not carry government cargo between a U.S. port and the CNMI unless it has a coastwise endorsement." Ex. 31, at 9.

210.    With respect to the age of the vessel, the Staff Memorandum states that "[t]his is largely a legal issue that the Office of Chief Counsel has analyzed in its Memorandum."  Ex. 31, at 9.

211.    With respect to the effect of the National Defense Authorization Act for 2017, the Staff Memorandum states that this "is largely a legal issue that has been analyzed by the Office of Chief Counsel in its attached Memorandum."  Ex. 31, at 10.

212.    The Staff Memorandum further states that "Matson asserts that all U.S.-flag vessels with registry endorsements are prohibited by the Covenant from engaging in trade with Saipan." Ex. 31, at 10.  Matson never made such an argument.

213.    With respect to whether APL is a "contractor" for purposes of the Northern Mariana Islands Covenant, the Staff Memorandum states that this "is largely a legal issue that has been analyzed by the Office of Chief Counsel in its attached Memorandum."  Ex. 31, at 10.

214.    The Staff Memorandum does not make any other findings regarding the APL SAIPAN's eligibility to join the MSP fleet.

215.    The Staff Memorandum concludes with the following recommendations to MARAD:

> (A) Find that the APL SAIPAN will provide transportation in foreign commerce pursuant to the requirements of 46 U.S.C. § 53102(b)(2) and 46 C.F.R. § 296.11(a)(2).

> (B) Determine, based on the finding in (A), that the APL SAIPAN satisfies the eligibility requirements of 46 U.S.C. §§ 53102(b)(2) and 46 C.F.R. § 296.11(a)(2);

> (C) Determine that the APL SAIPAN meets the eligibility requirements of 46 U.S.C. § 53102(b)(2) and 46 C.F.R. § 296.11(a)(2), even under an interpretation of 46 U.S.C. § 53102(b)(2) that requires a vessel, to be found eligible for the Fleet, be engaged exclusively in foreign commerce, or mixed foreign commerce and domestic trade allowed under a registry endorsement issued under 46 U.S.C. § 12111.

> (D) Determine that the APL SAIPAN has not been made ineligible as a replacement vessel by 46 U.S.C. § 53105(a)(2).

> (E) Determine that the APL SAIPAN has met the eligibility requirements of 46 U.S.C. § 53102(b)(3)(B) and 46 C.F.R. § 296.11(a)(3)(ii) and remains eligible under those provisions.

> (F) Reinstate the December 20, 2016 approval of the APL SAIPAN (IMO No. 9289207)) as a replacement of the container ship APL AGATE (IMO No. 9193264) under Maritime Security Program (MSP) Amended and Restated Operating Agreement No. MA/MSP-57.

Ex. 31, at 11.

### 4.    The Chief Counsel Memorandum

216.    The Chief Counsel Memorandum was issued on July 27, 2020, and provides legal analysis with respect to certain legal issues presented in the Staff Memorandum.

217.    With respect to the issue of whether the APL SAIPAN must be operated exclusively in foreign commerce in order to be eligible for the MSP, the Chief Counsel Memorandum states

MARAD has applied 46 U.S.C. § 53102(b)(2) "to require that a vessel need only engage in foreign commerce to be eligible for the Fleet."  Ex. 32, at 2.

218.   The Chief Counsel Memorandum offers two reasons for this reading:  first, "the MSA's structure reflects that Congress considered eligibility as a separate matter from trade restrictions that would be placed on the vessel after eligibility," and second, "the words Congress used in the eligibility requirement and the provision concerning Operating Agreement provisions are different."  Ex. 32, at 3.

219.   The Chief Counsel Memorandum then addresses "[t]wo issues raised by Matson in its recent submission, as well as in the District Court proceedings."  Ex. 32, at 4.

220.   The Chief Counsel Memorandum first addresses the language from the prior approval of the APL SAIPAN stating: "46 U.S.C. § 53102(b), clarified by 46 U.S.C. § 53105(a)(1)(A) requires that an eligible vessel be operated exclusively in the foreign commerce or mixed foreign commerce and domestic trade allowed under a registry endorsement issued under section 12111 of title 46, United States Code."  Ex. 32, at 4 (quotation marks omitted).

221.   The Chief Counsel Memorandum states that "MARAD interprets section 53102(b) according to its plain language, which does not incorporate section 53105(a)'s exclusivity requirement."  Ex. 32, at 4.

222.   The Chief Counsel Memorandum also states that "[t]he Staff Memorandum's sentence on which Matson relies was included because a United States Senator and Matson had claimed that the APL SAIPAN was not eligible for the Fleet because MSP vessels could not engage in the Guam trade."  Thus, the prior approval "'clarified' that trade with Guam did not render the Vessel ineligible for the Fleet under section 53102(b)(2)."  Ex. 32, at 5.

223.    The Chief Counsel Memorandum addresses MARAD's regulations, concluding that "[t]he language of the statutory and regulatory definitions is plainly inconsistent." "While the regulatory definition [of foreign commerce] works well with the other provisions in part 296, when applied to vessel eligibility determinations, it is more restrictive than Congress intended, thus creating an actual conflict between the regulation's eligib[ility] requirement and that of the MSA." Ex. 32, at 6 (footnote omitted).

224.    Thus, the Chief Counsel Memorandum continues, "[g]iven the requirement that a regulation be consistent [with] its enabling statute, MARAD must interpret its eligibility regulation at 46 C.F.R. § 296.11(a)(2) in a manner that does not conflict with the MSA." Ex. 32, at 6.

225.    Next, the Chief Counsel Memorandum states that "[g]iven the possibility that the Court could disagree with MARAD's interpretation of section 53102(b)(2), consideration of issues regarding trade with Saipan will facilitate any Court review of MARAD's disposition should Matson again seek judicial review." Ex. 32, at 6.

226.    The Chief Counsel Memorandum acknowledges that "[t]he Administrative Record reflects that MARAD simply overlooked the Vessel's operations in the Saipan trade." But, "[c]onsidering the matter now, the law provides that because the APL SAIPAN is documented with a registry endorsement, it may engage in the Saipan trade with respect to commercial cargo, but may not engage in the Saipan trade with respect to U.S. government cargo." Ex. 32, at 7.

227.    The Chief Counsel Memorandum states:

"[a]s to Government cargo, the Jones Act, as currently codified, provides that 'the coastwise laws do not apply to the Northern Marian Islands excepted as provided in Section 502(b) of the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America (48 U.S.C. § 1801 note).'   Read together, sections 502(b) and 503(a) of the Covenant essentially provide that U.S. coastwise laws do not apply to the CNMI, except with respect to 'the activities of the United States and its contractors in the Northern Mariana Islands.'   We think these provisions are best read to mean that only

coastwise-qualified vessels may carry Government cargo between a U.S. port and
Saipan in support of activities of a the Government or its contractors.

Ex. 32, at 7 (alterations and footnote omitted).

228.    The APL SAIPAN has previously carried government cargo to and from Saipan

without a coastwise endorsement while participating in the MSP, and therefore was in violation of

both its MSP Operating Agreement and the Jones Act.

229.    With respect to commercial cargo, the Chief Counsel Memorandum states that

under 46 U.S.C. § 12111 and the Coast Guard's regulation—46 C.F.R. § 67.17(a)—"there is no

law that requires a vessel engaging in the Saipan trade for commercial cargo to have a coastwise

or fisheries endorsement."  Ex. 32, at 7.

230.    The Chief Counsel Memorandum acknowledges Matson's arguments that "the

Coast Guard regulation does not apply here, because section 53105(a)(1)(A) only references

section 12111 and not the Coast Guard's implementing regulations," calling this interpretation

"extreme."  Ex. 32, at 8.

231.    The Chief Counsel Memorandum rejects this reading because, it opines, "such a

cramped interpretation would lead to an absurd result."  Ex. 32, at 8.

232.    The Chief Counsel Memorandum further opines that "when a statutory word is

'obviously transplanted from another legal source, whether the common law or other legislation,

it brings the old soil with it,'" and that "[b]ecause section 53105(a)(1)(A) refers to 'a registry

endorsement issued under section 12111 of this title' the 'old soil' that the section brings includes

the Coast Guard's interpretation of section 12111 in its regulations."  Ex. 32, at 8.

233.    The Chief Counsel Memorandum contends also that the principle that courts must

pay attention to "how Congress legislates across the entire *corpus juris* . . . . counsels against

reading the reference to section 12111 in the MSA in a way that is different from its meaning, as interpreted by the Coast Guard, in section 12111 itself." Ex. 32, at 8–9.

234.    With respect to the age of the APL SAIPAN and the 15-year age limit, the Chief Counsel Memorandum states that the issue does not arise here because the district court "remanded this matter to MARAD 'for further proceedings consistent with this Order and the Court's Amended Memorandum Opinion.'" Ex. 32, at 10.

235.    The Chief Counsel Memorandum states also that "the legal predicate for Matson's argument is the assertion that MARAD's current consideration of the issues constitutes a new proceeding," and that "in the context of adjudication, a 'remand' does not encroach upon administrative functions." Ex. 32, at 10.

236.    The Chief Counsel Memorandum further asserts that "[a]s an adjudication, MARAD's decision here will apply retroactively," and that "should MARAD determine, after further review and analysis upon this remand, that its Approval was appropriate, or issue another approval, it will apply retroactively." Ex. 32, at 11.

237.    With respect to the effect of the National Defense Authorization of 2018, the Chief Counsel Memorandum states that the amendment to Section 53105(a) "does not apply here" because the "APL SAIPAN is a replacement vessel; it was approved as a replacement for the APL AGATE in MARAD's 2016 approval, and under the Court's remand order if MARAD reinstates its approval, it will operate as a replacement for the APL AGATE." Ex. 32, at 11.

238.    The Chief Counsel Memorandum states further that "[t]he APL SAIPAN was covered by an Operating Agreement prior to the enactment of the 2018 NDAA, and was covered by that Operating Agreement afterward.  While the Court vacated MARAD's approval, it did not

vacate or otherwise nullify that Agreement, and the APL SAIPAN continues technically to be covered under it." Ex. 32, at 12.

239.    This assertion is inconsistent with the declaration MARAD submitted from the Director of MARAD's Office of Sealift Support in the prior litigation, who stated that "[v]acatur of the SAIPAN approval would mean that the vessel would no longer be subject to the MSP Operating Agreement." Ex. 23 ¶ 4.

240.    The Chief Counsel Memorandum next claims that "Matson asserts that the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States (Covenant) 'categorically' prohibits all trade to Saipan by U.S.-flag vessels with registry endorsements." Ex. 32, at 12–13.  Matson never made such an argument.

241.    With respect to whether APL is a "contractor" within the meaning of the Northern Mariana Islands Covenant, the Chief Counsel Memorandum states that "MARAD, through the Department of Justice, set forth its position and analysis on this issue in the District Court."  Ex. 32, at 14.

242.    The Chief Counsel Memorandum further contends that the phrase, "activities of the United States Government and its contractors" in the Northern Mariana Islands Covenant should be to read to include "only those contractors who are actually carrying out activities on behalf of the U.S. Government in the Northern Mariana Islands from a Jones Act port (or vice versa)."  Ex. 32, at 14.

243.    The Chief Counsel Memorandum's basis for this interpretation is that by specifying that the "activities" of United States contractors in the Northern Mariana Islands will be subject to the coastwise laws, the Northern Mariana Islands Covenant contemplates that "the contractor should be contracted to carry out activities in the Northern Mariana Islands for the Government –

rather than an entity that happens to have a Government contract and is independently carrying out activity in the Northern Mariana Islands (but not pursuant to that contract)."  Ex. 32, at 15.

## II.       Harm to Matson

244.    Matson has suffered economic injury as a result of MARAD's prior approval of the APL SAIPAN, and will continue to suffer injury as a result of MARAD's recent final agency action.

245.    Matson and APL are competitors in the Guam and Saipan trades.  Specifically, both Matson and APL operate vessels that transport cargo from the United States and its territories to Guam and Saipan, and from Guam and Saipan to other parts of the United States.

246.    Currently, Matson operates no vessels that receive MSP subsidies, including vessels that provide ocean freight services between other parts of the United States and its island territories of Guam and Saipan.

247.    As a result of the MSP subsidies, APL is able to offer significantly lower prices than Matson for shipping cargo on the same routes, driving carriage from Matson to APL and altering the competitive balance in this domestic market.

248.    Between the fall of 2016 and the fall of 2017, the same timeframe in which the APL SAIPAN was originally approved for inclusion in the MSP, the volume of containers Matson carried in the "Guam Service" declined by 23%.  *See* Matson, Inc. Form 8-K, Ex. 99.1 at 3–4 & Ex. 99.2 at 8 (Nov. 2, 2017), https://perma.cc/7W7N-HUXE.

249.    That volume has further declined since.  *See* Matson, Inc. Form 10-Q, at 19 (May 5, 2020), https://perma.cc/Z43L-8BQV (showing a decline in first quarter 2020 of 3.9 percent on a year-over-year basis); Matson, Inc. Form 10-K, at 26 (Feb. 28, 2020), https://bit.ly/329GWa8 (showing a decline in fourth quarter 2019 of 7.7 percent on a year-over-year basis); Matson, Inc.

Form 10-Q, at 17 (Nov. 8, 2019), https://bit.ly/3iViyze (showing a decline in third quarter 2019 of 2.1 percent on a year-over-year basis).

250.    For financial reporting purposes, Matson combines the freight volumes for cargo shipped to or from Guam and Saipan into a single category—the "Guam Service" reported above. Revenue from cargo shipped to or from Guam and Saipan is similarly combined for financial reporting purposes.  Therefore the decreased carriage reported by Matson includes both Guam and Saipan.

251.    MARAD's decisions have caused and will cause Matson to lose sales, lower prices, and/or expend more of its own resources to obtain business in the Guam and Saipan trades.  Since the APL SAIPAN first began to operate with MSP subsidies, Matson's unsubsidized vessels have lost carriage as measured in both volume of containers and revenue.

252.    Matson supports full and fair competition in all of its trade lines, but so long as APL is unlawfully receiving federal subsidies for its operation of the APL SAIPAN, Matson is not competing on a level playing field and will continue to incur injury.

253.    Congress did not and does not intend for vessels operating in the domestic trades, including the transportation of freight to and from Pacific island territories, to receive MSP subsidies.

### COUNT I
### (Administrative Procedure Act – Impermissible Domestic Trade in Violation of 46 U.S.C. §§ 53102(b)(2), 53103(a), 53105(a)(1)(A), 46 C.F.R. §§ 296.2, 296.11(a)(2))

254.    Matson incorporates the preceding paragraphs as if fully set forth herein.

255.    The APL SAIPAN is ineligible for MSP subsidies because it operates in impermissible domestic commerce in violation of the statute and implementing regulations.

256.    In order to be eligible for the MSP, a vessel must "provid[e] transportation in foreign commerce."  46 U.S.C. § 53102(b)(2).

257.    46 U.S.C. § 53105(a)(1)(A) further provides that a vessel operating pursuant to the MSP "shall be operated *exclusively* in the foreign commerce or . . . , in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under section 12111 of this title," and "shall not otherwise be operated in the coastwise trade."  46 U.S.C. § 53105(a)(1) (emphasis added).

258.    46 U.S.C. § 53103(a) provides that "[t]he Secretary shall require, as a condition of including any vessel in the Fleet, that the person that is the owner or operator of the vessel . . . enter into an operating agreement with the Secretary under this section."

259.    "Foreign commerce" is defined as "commerce or trade between the United States, its territories or possessions, or the District of Columbia, and a foreign country," and "commerce or trade between foreign countries."  46 U.S.C. § 53101(4).

260.    46 C.F.R. § 296.11(a)(2) similarly provides that a "vessel is eligible to be included in an MSP Operating Agreement if . . . [t]he vessel is operated or, in the case of a vessel to be purchased or constructed, will be operated to provide transportation in the foreign commerce."

261.    "Foreign commerce" is defined as:

a cargo freight service, including direct and relay service, operated *exclusively* in the foreign trade or in mixed foreign and domestic trade allowed under a registry endorsement under 46 U.S.C. [§] 12111 where the origination point or the destination point of any cargo carried is the United States, regardless of whether the vessel provides direct service between the United States and a foreign country, or commerce or trade between foreign countries.

46 C.F.R. § 296.2 (emphasis added).

262.    The APL SAIPAN provides transportation in domestic trade between the rest of the United States and Saipan.

263.    MARAD knew at the time of the 2020 Approval Order that the APL SAIPAN provides transportation in domestic trade between the rest of the United States and Saipan.

264.    Saipan is part of the United States as defined at 46 U.S.C. § 53101(10).  Vessels that transport cargo originating in the continental United States to Saipan, or transport cargo originating in Saipan to the continental United States, are therefore not engaged in foreign commerce within the meaning of 46 U.S.C. §§ 53101, 53102, and 53105, and 46 C.F.R. §§ 296.2 and 296.11.

265.    Saipan is not a territory for which domestic trade is allowed under a registry endorsement issued under 46 U.S.C. § 12111.

266.    46 U.S.C. § 12111(b) provides that "[a] vessel for which a registry endorsement is issued may engage in foreign trade or trade with Guam, American Samoa, Wake, Midway, or Kingman Reef."

267.    46 C.F.R. § 67.17—issued by the Coast Guard—cannot and does not augment the limited scope of domestic trade in which MSP vessels may engage.

268.    APL is a contractor of the United States.

269.    APL obtains MSP subsidies for the activities of the APL SAIPAN in domestic trade to and from Saipan.

270.    The transportation of domestic cargo to and from Saipan on the APL SAIPAN constitutes the activities of the United States and its contractors.

271.    The transportation of domestic cargo to and from Saipan on the APL SAIPAN is therefore coastwise trade within the meaning of the Northern Mariana Islands Covenant.

272.    Because the transportation of domestic cargo to and from Saipan on the APL SAIPAN is coastwise trade, that trade is not covered by a registry endorsement issued under 46 U.S.C. § 12111.

273.    Because the APL SAIPAN is engaged in domestic trade that is not covered by a registry endorsement pursuant to 46 U.S.C. § 12111, it does not operate "exclusively in the foreign commerce, or . . . , in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under section 12111 of this title," as required by 46 U.S.C. § 53105(a)(1)(A).

274.    Because the APL SAIPAN is engaged in domestic trade that is not covered by a registry endorsement pursuant to 46 U.S.C. § 12111, it does not operate "exclusively in the foreign trade or in mixed foreign and domestic trade allowed under a registry endorsement under 46 U.S.C. [§] 12111," as required by 46 C.F.R. §§ 296.2, 296.11.

275.    The APL SAIPAN is therefore ineligible for inclusion in the MSP, and the 2020 Approval Order approving the APL SAIPAN for inclusion in the MSP is arbitrary and capricious, and not in accordance with the law.

276.    MARAD's conclusion otherwise contradicts the statute and its own regulations, as well as MARAD's prior positions on the issue.

277.    In the 2016 Approval Order, MARAD expressly found that the APL SAIPAN would "provide transportation in foreign commerce or in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under 46 U.S.C. § 12111, pursuant to the requirement of 46 U.S.C. §§ 53102(b)(2) and 53105(a)(1)(A)." Ex. 14, at 1–2.

278.    This interpretation contemplates a *single* requirement under 46 U.S.C. §§ 53102(b)(2) and 53105(a)(1)(A) of operation in exclusive foreign commerce and domestic trade permitted under a registry endorsement.

279.    This finding would have been unnecessary in the 2016 Approval Order if, as MARAD now contends, the requirement of 46 U.S.C. § 53105(a)(1)(A) does not apply at the eligibility phase.

280.    The 2020 Approval Order is inconsistent with this prior interpretation.

281.    In the staff memorandum supporting the 2016 Approval Order, MARAD stated that "[u]nder 46 U.S.C. § 12111(b), a registry endorsement entitles a U.S. operator to engage in foreign trade or domestic trade with Guam, American Samoa, Wake, Midway or Kingman Reef." Ex. 13, at 4.

282.    This interpretation correctly recognizes that 46 U.S.C. § 12111 sets forth a discrete list of territories which may be served pursuant to a registry endorsement issued under 46 U.S.C. § 12111(b), and Saipan is not among those territories.

283.    The 2020 Approval Order is inconsistent with this prior interpretation.

284.    Even if the requirements of 46 U.S.C. § 53105(a)(1)(A) apply only to the operation of MSP vessels, and not to their eligibility, it would be arbitrary and capricious and an abuse of discretion for MARAD to approve a vessel for inclusion in the MSP if that vessel could not operate in the MSP.

285.    Thus, if 46 U.S.C. § 53105(a)(1)(A) applies only to the operation of MSP vessels, and not their eligibility, the 2020 Approval Order is arbitrary and capricious, an abuse of discretion, and not in accordance with the law, *see* 5 U.S.C. § 706(2)(A), and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, *see* 5 U.S.C. § 706(2)(C).

### COUNT II
### (Administrative Procedure Act – Violation of Vessel Age Requirements)

286.    Matson incorporates the preceding paragraphs as if fully set forth herein.

287.    The APL SAIPAN is too old to be included in the MSP fleet.

288.     46 U.S.C. § 53102(b)(3)(B) provides that a vessel is eligible for the MSP fleet if it is a vessel other than a tank vessel, and is "15 years of age or less on the date the vessel is included in the Fleet."

289.     The 2020 Approval Order was issued on August 3, 2020.

290.     August 3, 2020 is the date on which the APL SAIPAN was "included in the Fleet."

291.     As of August 3, 2020, the APL SAIPAN was more than 15 years of age.

292.     As of August 3, 2020, the APL SAIPAN was at least 17 years of age.

293.     As of August 3, 2020, the APL SAIPAN was too old to be included in the MSP Fleet.

294.     The fact that the APL SAIPAN was previously approved for inclusion in the MSP Fleet in 2016 does not alter the analysis because the 2016 Approval Order was *vacated* by the Court in the prior litigation.  Vacatur in this context means to annul, cancel, rescind, render void, deprive of force, or to make of no authority or validity.

295.     As a result of the vacatur of the 2016 Approval Order, the APL SAIPAN was never part of the Fleet, and thus the prior order cannot serve as a basis for excusing the age requirement.

296.     Even if, however, the APL SAIPAN was previously part of the MSP Fleet, the vacatur order removed it from the Fleet, and it was required to meet *all* eligibility requirements on remand in order to again be approved for inclusion in the Fleet.

297.     For the same reason, the APL SAIPAN's eligibility must be measured as of the time of its approval by MARAD in the 2020 Approval Order.

298.     At that time, the APL SAIPAN was too old to be included in the Fleet.

299.     46 U.S.C. § 53102(f) permits MARAD to waive the age restriction if the Secretary of Defense and the Secretary of Transportation jointly determine that such waiver (1) "is in the

national interest," (2) "is appropriate to allow the maintenance of the economic viability of the vessel and any associated operating networks"; and (3) "is necessary due to the lack of availability of other vessels and operators that comply with the requirements of this chapter."

300.    In the 2020 Approval Order, MARAD did not invoke Section 53102(f), and there is no indication that the Secretary of Defense or the Secretary of Transportation made the findings necessary for a waiver of the age restriction.

301.    There is no basis for a waiver of the age restriction here, and upon information and belief, no such waiver has ever been given before.

302.    For that reason, the 2020 Approval Order is arbitrary and capricious, and not in accordance with the law, *see* 5 U.S.C. § 706(2)(A), and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, *see* 5 U.S.C. § 706(2)(C).

## COUNT III
### (Administrative Procedure – Impermissible Domestic Trade in Violation of 46 U.S.C. § 53105(a)(2))

303.    Matson incorporates the preceding paragraphs as if fully set forth herein.

304.    The APL SAIPAN engages in impermissible domestic trade in violation of 46 U.S.C. § 53105(a)(2).

305.    46 U.S.C. § 53105(a)(2) provides:

[I]n the case of a vessel, other than a replacement vessel under subsection (f), first covered by an operating agreement after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2018, the vessel shall not be operated in the transportation of cargo between points in the United States and its territories either directly or via foreign port[.]

306.    The date of the enactment of the National Defense Authorization Act for Fiscal Year 2018 is December 17, 2017.

307.    The 2020 Approval Order was issued after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2018.

308.    Because the prior approval order was vacated, the APL SAIPAN was "first covered by an operating agreement after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2018."

309.    The APL SAIPAN is not a "replacement vessel under subsection (f)."

310.    The APL AGATE, which is the vessel MARAD states the APL SAIPAN is "replacing," has not been in service for over three years.

311.    Treating the APL SAIPAN as a "replacement vessel" would violate MARAD's "heel to toe" vessel replacement policy.

312.    The APL SAIPAN operates in the transportation of cargo between points in the United States and its territories either directly or via foreign port.

313.    The APL SAIPAN is thus ineligible for inclusion in the MSP pursuant to 46 U.S.C. § 53105(a)(2).

314.    Even if the requirements of 46 U.S.C. § 53105(a)(2) apply only to the operation of MSP vessels, and not to their eligibility, it would be arbitrary and capricious and an abuse of discretion for MARAD to approve a vessel for inclusion in the MSP if that vessel could not operate in the MSP.

315.    Thus, if 46 U.S.C. § 53105(a)(2) applies only to the operation of MSP vessels, and not their eligibility, the 2020 Approval Order is arbitrary and capricious, an abuse of discretion, and not in accordance with the law, *see* 5 U.S.C. § 706(2)(A), and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, *see* 5 U.S.C. § 706(2)(C).

### COUNT IV
### (Administrative Procedure Act – Failure to Make Statutory Findings)

316.    Matson incorporates the preceding paragraphs as if fully set forth herein.

317.    MARAD did not address at all several of the eligibility requirements set forth in 46
U.S.C. § 53102(b), including 46 U.S.C. §§ 53102(b)(1), 53102(b)(4), and 53102(b)(5).

318.    Because the prior approval order was vacated, MARAD was required to make *all*
eligibility findings required by the statute and regulations before approving the APL SAIPAN for
inclusion in the MSP fleet.

319.    MARAD's failure to make these findings renders the 2020 Approval Order
arbitrary and capricious, an abuse of discretion, and not in accordance with the law, *see* 5 U.S.C.
§ 706(2)(A), and in excess of statutory jurisdiction, authority, or limitations, or short of statutory
right, *see* 5 U.S.C. § 706(2)(C).

## COUNT V
### (Administrative Procedure Act – Unlawful Denial of Intervention)

320.    Matson incorporates the preceding paragraphs as if fully set forth herein.

321.    5 U.S.C. § 555(b) provides, in relevant part, that "[s]o far as the orderly conduct of
public business permits, an interested person may appear before an agency or its responsible
employees for the presentation, adjustment, or determination of an issue, request, or controversy
in a proceeding, whether interlocutory, summary, or otherwise, or in connection with an agency
function."

322.    5 U.S.C. § 555(b) provides no exception to the preceding provision for "informal"
agency action.

323.    46 C.F.R. § 201.78, entitled "Petition for leave to intervene," was promulgated by
MARAD.

324.    46 C.F.R. § 201.78 provides, in relevant part:

A petition for leave to intervene may be filed in any proceeding before the
Administration.  The petition will be granted by the presiding officer if the proposed
intervenor establishes that it has a substantial interest in the proceeding and will not

unduly broaden the issues therein or unduly delay the proceeding. . . .  Intervention petitions will be granted where necessary to protect substantial interests of the petitioner and where intervention will not materially broaden the issues.

325.    Matson filed a timely Petition to Intervene in the administrative proceedings on remand.

326.    Matson was an "interested person" within the meaning of 5 U.S.C. § 555(b) in the proceedings on remand regarding APL's application to approve the APL SAIPAN for the MSP fleet.

327.    In the Intervention Order, MARAD did not find that permitting Matson to intervene in the administrative proceedings would disrupt the "orderly conduct of public business."

328.    Matson's intervention in the administrative proceedings would not have disrupted the "orderly conduct of public business."

329.    The administrative proceedings on remand constituted "any proceeding before the Administration."

330.    In the Intervention Order, MARAD did not decide whether Matson had a "substantial interest in the proceeding," or whether its intervention would "unduly broaden the issues therein or unduly delay the proceeding."

331.    Matson did, in fact, have a "substantial interest in the proceeding," and its intervention would not have "unduly broaden[ed] the issues therein or unduly delay[ed] the proceeding."

332.    Matson did not receive and has not received any submissions from APL in connection with its application to approve the APL SAIPAN.

333.    Matson did not receive and has not received any statements, orders, or communications from MARAD other than those referenced above and attached to this complaint.

334.   The Intervention Order both violated 5 U.S.C. § 555(b), and was in violation of MARAD's own regulation.

335.   The Intervention Order prejudiced Matson because it did not have access to APL's submission to MARAD and thus could not fully respond to any arguments made by APL in support of its application.

336.   As a result of the above, the Intervention Order was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, *see* 5 U.S.C. § 706(2)(A), and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, *see* 5 U.S.C. § 706(2)(C).

337.   Because the Intervention Order unlawfully denied Matson its statutory and regulatory right to participate in the administrative proceedings on remand, the 2020 Approval Order was similarly not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, *see* 5 U.S.C. § 706(2)(A), and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, *see* 5 U.S.C. § 706(2)(C).

## PRAYER FOR RELIEF

WHEREFORE, Matson prays that this Court:

1.   Declare the 2020 Approval Order unlawful.

2.   Vacate and set aside the 2020 Approval Order.

3.   Enjoin MARAD from approving the APL SAIPAN under the MSP, or from paying any subsidies to APL for operating the APL SAIPAN.

4.   Declare that MARAD is permitting the APL SAIPAN to sail, and paying subsidies, notwithstanding that the APL SAIPAN is not in compliance with its MSP Operating Agreement.

5.   Declare the Intervention Order unlawful.

6.      Vacate and set aside the Intervention Order, and if the Court does not vacate and set aside the 2020 Approval Order for the reasons set forth in Counts I–IV, vacate and set aside the 2020 Approval Order and remand so that Matson may fully participate in the administrative proceedings.

7.      Award Matson its costs and reasonable attorney's fees as appropriate.

8.      Grant such further relief as this Court deems proper.


Respectfully submitted,


Dated:    September 30, 2020          s/ *Mark A. Perry*
                                     Mark A. Perry, DC Bar No. 438203
                                     MPerry@gibsondunn.com
                                     Joshua M. Wesneski, DC Bar No. 1500231
                                     JWesneski@gibsondunn.com
                                     GIBSON, DUNN & CRUTCHER LLP
                                     1050 Connecticut Avenue, N.W.
                                     Washington, D.C. 20036
                                     (202) 955-8500

                                     Rachel S. Brass, *pro hac vice forthcoming*
                                     RBrass@gibsondunn.com
                                     GIBSON, DUNN & CRUTCHER LLP
                                     555 Mission Street, Suite 3000
                                     San Francisco, CA 94105
                                     (415) 393-8200

                                     *Counsel for Plaintiff Matson Navigation Company, Inc.*